UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KMK GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 6361 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| HELCO CORP. and CHICAGO TITLE LAND TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

KMK Group, LLC sues Helco Corp. and its mortgage trustee Chicago Title Land Trust

Company (together, "Helco"), alleging that by not timely responding to KMK's request to

amend the parties' contract, Helco breached the contract and interfered with KMK's prospective

economic advantage. Doc. 1. Helco moves to dismiss under Civil Rule 12(b)(6). Doc. 20. The

motion is granted in part and denied in part.

**Background**

In resolving Helco's Rule 12(b)(6) motion, the court must accept the complaint's well-

pleaded factual allegations, with all reasonable inferences drawn in KMK's favor, but not its

legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016).

The court must also consider "documents attached to the complaint, documents that are critical

to the complaint and referred to in it, and information that is subject to proper judicial notice,"

along with additional facts set forth in KMK's brief opposing dismissal, so long as those

additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714

F.3d 1017, 1019-20 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as

favorably to KMK as those materials permit. *See Domanus v. Locke Lord, LLP*, 847 F.3d 469,

1

478-79 (7th Cir. 2017).  In setting forth the facts at this stage, the court does not vouch for their

"objective truth."  *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

KMK, a California commercial real estate manager, and Helco, an Illinois corporation,

own separate parcels in McHenry Plaza, a shopping center in McHenry, Illinois.  Doc. 1 at ¶¶ 1-

3, 6, 12, 15, 21.  The Second Amended Operation and Easement Agreement ("OEA") governs

the relationship among KMK, Helco, and the other parcel owners.  *Id*. at ¶¶ 7, 26.  The OEA

identifies the parcel owners as "Parties."  *Ibid*.; Doc. 1-1 at 5, 7.

Section 6.5 of the OEA, which governs circumstances where a Party must obtain consent

or approval from another Party, provides:

> **6.5  <u>Approval Rights</u>.**
>
> (A)   Nothing contained in this OEA shall limit the right of a Party to exercise
> its business judgment, or act, in a subjective manner, with respect to any
> matter as to which it has been specifically granted such right, or the right to
> act in its sole discretion or sole judgment, whether "objectively" reasonable
> under the circumstances … .
>
> (B)   Unless otherwise herein provided, whenever a consent or approval (the
> "approval") is required, such approval shall not be unreasonably withheld or
> delayed.  Unless provision is made for a specific time period, each response to
> a request for an approval shall be given by the Party to whom directed within
> thirty (30) days of receipt of such request.  Any disapproval shall be in writing
> and the reasons therefor shall be clearly stated.  If a response is not given
> within the required time period, the requested Party shall be deemed to have
> given its approval.
>
> (C)   If the Approving Parties' approval is requested, unanimous approval
> must be given.

Doc. 1-1 at 39.  In essence, Section 6.5(B) provides as a general matter that a Party must give its

approval or disapproval within thirty days of a request, or else be deemed to have approved, and

must justify any disapproval in writing.

Section 6.8(E), which governs amendments, provides: "This OEA may be amended by,

and only by, a written agreement signed by all of the then current Approving Parties."  *Id*. at 40.

2

Section 1.1 provides that one "Approving Party" shall represent the "Developer Tract" and another shall represent the "Target Tract," and that each shall be "designated from time to time to make certain decisions and/or give certain approvals pursuant to the terms of [the] OEA." Doc. 1 at ¶ 29; Doc. 1-1 at 5-6. Helco is the Approving Party for the Developer Tract, while non-party Illinois Realty, LLC is the Approving Party for the Target Tract. Doc. 1 at ¶¶ 13, 30, 32.

In December 2017, KMK entered into an agreement with Chicago Bread, a Panera Bread franchisee, to redevelop and lease KMK's parcel. *Id*. at ¶¶ 38-39, 41. A condition precedent to the agreement was the adoption of an OEA amendment that would permit the redevelopment. *Id*. at ¶ 44. In early 2018, a proposed redevelopment plan was distributed to the other property owners, and Hamra Enterprises, the property development company that controlled and managed Chicago Bread, *id*. at ¶ 39, discussed amending the OEA with them. *Id*. at ¶¶ 50-51.

On June 7, 2018, KMK and Chicago Bread amended their redevelopment/lease agreement to provide that Chicago Bread could terminate the agreement if it could not in good faith secure the OEA amendment by August 6, 2018. *Id*. at ¶¶ 46-49. On June 13, 2018, Hamra Vice President Ben Kaplan emailed all parcel owners a proposed Third Amendment to the OEA. *Id*. at ¶ 55. The email stated that Chicago Bread would terminate its agreement with KMK if it could not secure the amendment by August 6, 2018. *Ibid*. The proposed amendment designated the area in which the planned redevelopment would take place, required KMK's parcel to leave twenty-four parking spaces available to Panera customers, and replaced a provision allowing KMK's former tenant Arby's to post Arby's signs with one permitting any restaurant occupant of KMK's parcel to post its signs. *Id*. at ¶¶ 57-59; Doc. 1-1 at 62. None of these changes would have negatively affected any other store in the shopping center. Doc. 1 at ¶ 56.

3

On July 7, 2018, Kaplan sent an email to all parcel owners attaching a revised proposed Third Amendment, noting in bold and underlined font that all parties had "agreed in concept to the attached, with the one owner exception of [Helco President] Heather Mooney," from whom Kaplan had received no comment. *Id*. at ¶¶ 20, 61. Kaplan stated that he hoped to finish the amendment process by July 20. *Id*. at ¶ 61. On July 12, Kaplan told KMK that all parcel owners other than Helco had agreed to the proposed amendment. *Id*. at ¶ 63.

No later than July 13, 2018, Mooney sent Kaplan suggested revisions to the proposed amendment and expressed her belief that two Helco tenants, a Sears Outlet store and a Great Clips hair salon, had "approval rights" over OEA amendments. *Id*. at ¶¶ 63-64. Mooney stated that she did not want to ask the tenants for approval until the proposed amendment was finalized. *Id*. at ¶ 64. The OEA did not require Helco to obtain its tenants' approval before signing an amendment. *Id*. at ¶ 70. In a July 13 email, Kaplan attached a final draft proposed amendment incorporating Mooney's suggestions and asked Mooney to "immediately go[] to her two tenants to seek approval," reminding her of the August 6 "drop dead date" and asking all Approving Parties to execute the amendment by July 27. *Id*. at ¶ 64.

All parcel owners except Helco approved the proposed Third Amendment by July 27, 2018. *Id*. at ¶¶ 65-68. On July 31, Kaplan told the parcel owners in an email that he "ha[d] been told that [Mooney] went to the two tenants" and had "heard … from a local official" that the tenants "have no issue and would welcome Panera to the center." *Id*. at ¶ 69. Kaplan again reminded Mooney about the August 6 deadline. *Ibid*. Kaplan emailed Mooney again on August 1, asking her if Helco would sign the amendment if Sears and Great Clips consented. *Id*. at ¶ 71. Mooney responded, "Our attorney already explained this to you." *Ibid*.

4

By August 3, Helco still had not approved the proposed amendment, so KMK and Chicago Bread amended their redevelopment/lease agreement to extend the "drop dead date" to August 20, 2018. *Id*. at ¶ 74. Kaplan told Mooney about the new deadline in an August 7 email, adding that the deadline would not be extended further and that Chicago Bread would terminate the agreement if it could not secure the OEA amendment. *Id*. at ¶ 75. Mooney did not respond. *Id*. at ¶¶ 76-77. On August 14, a representative from Sears told McHenry officials that it had approved the proposed OEA amendment, McHenry's mayor relayed this information to Kaplan, and Kaplan called Mooney and left a message on her voicemail. *Id*. at ¶ 78. Mooney did not call back that day. *Ibid*. In an August 15 phone call, Mooney told Kaplan that she would approve the proposed amendment only if Chicago Bread agreed to indemnify Helco against any claims brought by Sears against Helco due to the redevelopment. *Id*. at ¶ 79. Kaplan refused. *Ibid*.

That day, Kaplan called Mooney's primary contact at Sears. *Id*. at ¶ 80. The Sears contact told Kaplan that Sears was not required to consent to OEA amendments under its agreement with Helco, but said that Sears would consent if Helco reduced its rent. *Id*. at ¶¶ 81-82. Helco refused to reduce Sears's rent or to sign the amendment without Sears's approval. *Id*. at ¶¶ 81-82. Sears later emailed McHenry's mayor to say that it did not "want [McHenry] to suffer" because the deal fell through, but that it "was not required to sign" and Helco did not "need to ask [Sears] to sign" a consent to the amendment. *Id*. at ¶ 83. Sears stated that it hoped Helco would "sign the consent form without involving" Sears. *Ibid*. Kaplan emailed Mooney the next day to say that Sears did not believe it had to agree to the amendment and asking why Mooney refused to sign the amendment, but Mooney did not respond. *Id*. at ¶¶ 86-87.

Mooney did not approve or disapprove the amendment or provide any updates to KMK or Chicago Bread between August 16 and August 20. *Id*. at ¶ 88. On August 20, Chicago Bread

terminated its agreement with KMK.  *Id*. at ¶ 89.  On August 21, the day after the August 20

deadline, Mooney told Kaplan that Sears had consented to the amendment and asked him to

"[l]et [Helco] know the status of the transaction."  *Id*. at ¶ 93.  Mooney never explained in

writing why she believed her approval of the amendment was contingent on Sears's consent.  *Id*.

at ¶ 91.  KMK alleges that Helco used Sears's unwillingness to consent as a pretext, and that

Helco delayed approving the proposed OEA amendment in bad faith.  *Id*. at ¶ 92.

**Discussion**

KMK alleges that Helco breached Section 6.5(B) of the OEA by not approving or

disapproving the amendment or justifying any disapproval in writing within thirty days.  *Id*. at

¶¶ 97-129.  KMK also alleges that Helco intentionally interfered with KMK's prospective

economic advantage by delaying its approval in bad faith until after Chicago Bread terminated

the redevelopment/lease agreement with KMK.  *Id*. at ¶¶ 130-38.  KMK moves to dismiss both

claims.  Doc. 20.

I.      **Breach of Contract Claim**

The parties agree that Illinois law governs KMK's contract claim.  Doc. 21 (citing Illinois

law); Doc. 28 (same).  An Illinois breach of contract plaintiff must allege: "(1) the existence of a

valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract

by the defendant; and (4) resultant injury to the plaintiff."  *Avila v. CitiMortgage, Inc.*, 801 F.3d

777, 786 (7th Cir. 2015).

"The basic rules of contract interpretation under Illinois law are well settled.  In

construing a contract, the primary objective is to give effect to the intention of the parties."

*Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 689-90 (7th Cir.

2017).  "A court must initially look to the language of a contract alone, as the language, given its

6

plain and ordinary meaning, is the best indication of the parties' intent." *Id*. at 690 (quoting

*Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). "Moreover, because words derive their

meaning from the context in which they are used, a contract must be construed as a whole,

viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58. Illinois courts strive to

"adopt[] an understanding of the [contract] language that is natural and reasonable." *Land of*

*Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014).

Where a specific contract provision "arguably conflicts with a more general provision," "the

more specific provision … governs." *Aeroground, Inc. v. CenterPoint Properties Tr.*, 738 F.3d

810, 816 (7th Cir. 2013) (citing *Grevas v. U.S. Fid. & Guar. Co.*, 604 N.E.2d 942, 944 (Ill.

1992)); *see also Aircraft Owners & Pilots Ass'n v. Hinson*, 102 F.3d 1421, 1425 (7th Cir. 1996)

("[I]t is a well-established rule that specific provisions trump general ones."); *Medcom Holding*

*Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 227 (7th Cir. 1993) (same).

   "If the words in the contract are clear and unambiguous, they must be given their plain,

ordinary and popular meaning." *Right Field Rooftops*, 870 F.3d at 690 (quoting *Cent. Ill. Light*

*Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004)). In that event, the court must evaluate the

sufficiency of the plaintiff's allegations in light of the contract's plain meaning. *See id*. at 691

(affirming dismissal where the defendants' theory of breach could not be reconciled with the

"plain language" of the contract). By contrast, "[i]f the language of the contract is susceptible to

more than one meaning, it is ambiguous," and "a court may consider extrinsic evidence to

ascertain the parties' intent." *Gallagher*, 874 N.E.2d at 58. In that event, "construction of the

agreement is a question of fact." *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014).

   As noted, KMK alleges that Helco breached Section 6.5(B) by unreasonably withholding

its approval of the proposed OEA amendment and by not explaining in writing its reasons for

approving or disapproving the amendment within thirty days. Doc. 1 at ¶¶ 97-129. According to KMK, Section 6.5(B) reasonably can be read "to apply in *all* situations where a party has been asked to give 'a formal sanction to' a request under the OEA," including a request to agree to a proposed OEA amendment. Doc. 28 at 11 (emphasis added) (quoting *Approve*, Black's Law Dictionary (10th ed. 2014)). Thus, KMK argues, a reasonable jury could find that Helco was obligated to respond to Chicago Bread's request to approve the proposed OEA amendment in the manner set forth in Section 6.5(B). *Ibid.* Helco responds that Section 6.8(E), not Section 6.5(B), governs requests to approve proposed OEA amendments, and therefore that it could not have breached Section 6.5(B) in connection with the request to approve the proposed amendment. Doc. 21 at 4-11.

Helco is correct as a matter of law: Under the general/specific canon referenced above, Section 6.5(B) does not govern requests to approve OEA amendments. As noted, Section 6.5(B) provides that if a party does not respond to a request for approval within thirty days, "the requested party shall be deemed to have given its approval." Doc. 1-1 at 39. If a request to sign a proposed OEA amendment were governed by Section 6.5(B), then an Approving Party that did not respond to such a request would be deemed to have approved the amendment. Section 6.8(E), however, provides that the OEA can be amended "by, and *only* by, a written agreement signed by all of the then current Approving Parties." Doc. 1-1 at 40 (emphasis added). Therefore, Section 6.5(B) contemplates a general method of approval (silence) that Section 6.8(E) precludes in the specific context of proposed OEA amendments. For that reason, Section 6.8(E), not Section 6.5(B), applies to requests to approve amendments. *See Aeroground*, 738 F.3d at 816 (holding that the plaintiff was required under a specific contract provision to pay for

"floor repairs" even though a more general provision required the defendant to pay for "damage").

KMK cites no authority to counter Helco's invocation (Doc. 121 at 8) of the general/specific canon to resolve whatever tension exists between Sections 6.5(B) and 6.8(E), thereby forfeiting any such argument. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … ."). KMK instead questions the premise underlying Helco's invocation of the canon by arguing that there is in fact no tension to resolve between Section 6.5(B) and Section 6.8(E). According to KMK, the OEA contemplates a two-step amendment process: The Approving Parties first must approve the proposed amendment under Section 6.5(B), and then must "final[ize]" the amendment by drawing up and signing a written agreement under Section 6.8(E). Doc. 28 at 10-11.

KMK's interpretation of the OEA cannot be reconciled with its text. The reason is simple: By providing that the OEA "may be amended by, and only by, a written agreement signed by all of the then current Approving Parties," Doc. 1-1 at 40, Section 6.8(E) plainly conveys that a written agreement signed by the Approving Parties is not only necessary, but also sufficient, to effectuate an amendment. Section 6.8(E) thus leaves no role for Section 6.5(B) to play in the amendment approval process.

9

Nor is KMK's reading a "natural" or "reasonable" construction of Section 6.8(E) in the context of the OEA as a whole. *Land of Lincoln*, 762 F.3d at 679. KMK does not explain, and the court cannot imagine, what function the supposed Section 6.5(B) pre-amendment approval process would serve that an amendment signed under Section 6.8(E) would not. Would an Approving Party be bound by a pre-amendment approval under Section 6.5(B), even if the Approving Party were deemed to have approved only because it failed to respond within thirty days to a request for approval? If not, then the supposed pre-amendment approval process would be superfluous to the process under Section 6.8(E). If so, the supposed pre-amendment approval process would frustrate the purpose of Section 6.8(E), which is to ensure that no Approving Party is bound by an amendment without agreeing to it in writing.

KMK also argues that because Section 6.8(E) provides that a proposed amendment can go into effect only with the agreement of the "Approving Parties," requests to approve proposed amendments must be governed by Section 6.5(B). Doc. 28 at 12. That argument fails to persuade. Section 6.5(B) does not use the term "Approving Parties," a fact that itself defeats KMK's submission that Section 6.8(E)'s reference to "Approving Parties" necessarily refers back to Section 6.5(B). The OEA uses the term "Approving Party" not to invoke Section 6.5(B), but simply to identify precisely who must agree to a proposed amendment: the representative from the Target Tract (currently, Indiana Realty) and the representative from the Developer Tract (currently, Helco), as distinct from all "Parties" to the OEA. In some circumstances, such as under Section 6.8(E), the Approving Parties' role is to decide whether to approve something, while in others, the Approving Parties have no authority to approve or disapprove the action in question. *E.g.*, Doc. 1-1 at 13 ("[E]ach Party *reserves the right* to create a temporary staging and/or storage area in the Common Area on its Tract ... . [A] Party shall give the Approving

Parties at least thirty (30) days prior notice of the proposed location of such staging and/or storage area … .") (emphasis added). Thus, by providing that a proposed amendment requires the approval of the two Approving Parties, Section 6.8(E) simply identifies which Parties' approval is required for a proposed amendment; it does not subject requests to approve a proposed amendment to the Section 6.5(B) process.

Finally, KMK argues that Helco violated the duty of good faith and fair dealing by failing to respond reasonably or without delay to KMK's requests to amend. Doc. 28 at 13-14 (citing *Hilfiker Square, LLC v. Thrifty Payless, Inc.*, 2016 WL 7031283, at *4 (D. Or. Nov. 29, 2016)). That argument fails because, under Illinois law, "there is no inherent duty of good faith with respect to contract formation." *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 592 (7th Cir. 2012). Although parties can agree to negotiate in good faith, such an agreement is made only if "[l]anguage in the relevant document … indicate[s] that good faith negotiations were contemplated," and a court may "not read into the agreement terms that do not exist." *Ibid*. There is no basis in the OEA to conclude that the parties agreed to negotiate amendments to the OEA, particularly since, as shown above, Section 6.5(B) does not apply to amendments.

In sum, the OEA is unambiguous: Section 6.5(B) does not apply to proposed amendments to the OEA, and Helco therefore could not have breached Section 6.5(B) by refusing to respond, or to respond in a certain way, to KMK's request that Helco agree to its proposed amendment. Accordingly, KMK's breach of contract claim is dismissed.

## II. Intentional Interference with Prospective Economic Advantage Claim

"The elements of [an intentional interference with prospective economic advantage] claim are: (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful or intentional

interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003). Helco moves to dismiss KMK's intentional interference claim on the ground that the complaint's allegations establish that Helco's conduct was privileged. Doc. 21 at 12-15.

Illinois law "recognize[s] a privilege in [certain tort] cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989). The privilege extends to a business's interference with another business's prospective economic advantage in the course of pursuing its own financial interests. *See Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 375 (7th Cir. 1992) (observing that "[i]nterference designed to protect one's financial interest is generally privileged"); *IK Corp. v. One Fin. Place P'ship*, 558 N.E.2d 161, 172 (Ill. App. 1990) ("Interference [in a prospective economic advantage] is … justified to protect one's financial interest."), *superseded by statute in other part as recognized in Royal Imperial Grp., Inc. v. Joseph Blumberg & Assocs., Inc.*, 608 N.E.2d 178 (Ill. App. 1992); *Bank Computer Network Corp. v. Cont'l Ill. Nat. Bank & Tr. Co. of Chi.*, 442 N.E.2d 586, 592 (Ill. App. 1982) (holding that the defendant's alleged interference with the plaintiff's prospective economic advantage "was a privileged action taken to protect its own present, existing economic interest"). "If the defendant's interference is privileged, the plaintiff bears the burden of proving that the defendant's conduct was malicious." *Delloma v. Consol. Coal Co.*, 996 F.2d 168, 171 (7th Cir. 1993). The defendant's conduct is malicious, and the privilege is overcome, if the defendant acts "intentionally and without justification." *Ibid.*; *see also Stafford v. Puro*, 63 F.3d 1436, 1442 (7th Cir. 1995) (same); *HPI Health Care*, 545

12

N.E.2d at 677 (same). "Illinois courts have not provided a definitive answer" concerning whether privilege must be asserted as an affirmative defense or whether the plaintiff must prove that no privilege applies, but there is no need to resolve that question at the pleading stage if the plaintiff's "allegations overcome the privilege." *Webb v. Frawley*, 906 F.3d 569, 578 (7th Cir. 2018).

KMK does not deny that Helco enjoys a privilege to pursue its own financial interest, but instead argues that the complaint's allegations give rise to the inference that Helco acted with malice. Doc. 28 at 16. Helco responds that the complaint shows that it acted to protect its own financial interests by taking steps to ensure that Sears would not sue it due to the amendment. Doc. 21 at 13-15. KMK has the better of the argument.

First, KMK pleads facts allowing a reasonable inference that Helco's refusal to agree to the proposed OEA amendment in a timely manner was "without justification," *Delloma*, 996 F.2d at 171, serving as a pretext for its tortious conduct. KMK alleges that the proposed OEA amendment—which would have allowed an operational restaurant to replace a defunct one and to post signs and maintain parking spaces—were minor and would not have negatively affected the shopping center's other stores. Doc. 1 at ¶¶ 57-59. KMK also alleges that Sears repeatedly stated that it was not opposed to the amendment, *id*. at ¶ 69 (alleging that Chicago Bread told Mooney that it had learned that Sears had "no issue and would welcome Panera to the center"); *id*. at ¶ 78 (alleging that Sears told McHenry officials that it approved of the amendment); *id*. at ¶ 83 (alleging that Sears told McHenry's mayor that it hoped Helco would agree to the amendment without involving Sears), and that Helco did not need to secure Sears's consent to agree to the amendment, *id*. at ¶¶ 80-83. One could infer from these facts that the proposed OEA amendment would not have created a meaningful risk of liability to Helco and that Helco was not

13

obligated secure Sears's consent before agreeing to it.  If so, then one could reasonably infer that Helco's purported justification for not agreeing to the amendment was no justification at all.  *See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 679-80, 685-86 (7th Cir. 2014) (where the defendant asserted that its alleged tortious interference was a result of the plaintiff's own breach of contract, holding that the plaintiff adequately pleaded malice by alleging that it had not breached the contract and that the defendant's assertions to the contrary were in bad faith); *Capital Options Investments, Inc. v. Goldberg Bros. Commodities*, 958 F.2d 186, 189-91 (7th Cir. 1992) (analyzing the circumstances surrounding the defendant's proffered business justification to determine whether the justification was offered in bad faith).

The complaint's allegations give rise to the further inference that Helco "intentionally" delayed its approval decision.  *Delloma*, 996 F.2d at 171.  The complaint alleges that Helco delayed maliciously and in bad faith, states of mind that may be alleged generally.  *See Armstrong v. Daily*, 786 F.3d 529, 547 (7th Cir. 2015) ("Rule 9(b) allows states of mind [including bad faith] to be alleged generally."); *see also Delloma*, 996 F.2d at 171 ("Privilege exists if the defendant acted *in good faith* to protect an interest or uphold a duty.") (emphasis added).  Specific allegations in the complaint buttress the point.  Helco was slow and unresponsive through every step of the amendment process despite Chicago Bread's repeated reminders that time was of the essence, while the other parcel owners were willing and able to approve the amendment well before the deadline.  Doc. 1 at ¶¶ 61, 64-68, 76-78, 86-88.  Helco's dilatory approach lends support to KMK's theory that the delay was intentional.  Moreover, when confronted by Chicago Bread, Helco did not even attempt to explain why it insisted on getting Sears's consent despite the allegedly minimal litigation risk and comments from Sears that arguably should have allayed any remaining concerns.  *Id*. at ¶¶ 71, 86-87.  It is reasonable

14

to infer that Helco did not answer Chicago Bread's questions because it could not provide a reasoned justification, which in turn supports an inference that Helco's proffered justification was a pretext. Finally, Helco was suddenly and inexplicably able to secure a satisfactory consent from Sears the *day after* Chicago Bread terminated its agreement with KMK, a feat it supposedly was unable to accomplish in all the weeks and months before. *Id*. at ¶ 93. It is reasonable to infer that whatever Helco did to resolve its concerns with the proposed OEA amendment could have been done at least twenty-four hours, if not days or weeks, sooner. Considered along with the general allegations of bad faith, these factual allegations are sufficient to plead intentional conduct.

Because a reasonable jury could infer from the allegations in KMK's complaint that Helco delayed intentionally and without justification, KMK has met its burden to allege malice and thus to overcome Helco's asserted privilege at the pleading stage.

Helco also argues that an independent source of privilege arises from various OEA provisions reserving the right of parcel owners to make business judgments even if those judgments are not objectively reasonable. Doc. 21 at 13-14; Doc. 30 at 12. Because Helco cites no authority for the proposition that a contract provision can itself give rise to a privilege defense to an intentional interference claim, the argument is forfeited for purposes of this motion. *See M.G. Skinner*, 845 F.3d at 321. In any event, even if an OEA contract provision privileged Helco's conduct, privilege can be overcome by showing that the defendant acted maliciously, as Helco is alleged to have done. *See Delloma*, 996 F.2d at 171-72. Helco's intentional interference with a prospective economic advantage claim therefore survives dismissal.

## Conclusion

Helco's motion to dismiss is granted as to KMK's contract claim and denied as to its intentional interference with prospective economic advantage claim. The contract claim is dismissed without prejudice to KMK filing an amended complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). KMK has until May 28, 2019 to file an amended complaint. If it does not do so, the dismissal of the contract claim will convert automatically to a dismissal with prejudice. If KMK repleads, Helco will have until June 18, 2019 to respond to the amended complaint.

May 8, 2019

_____
United States District Judge

16